IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| THOMAS A. MOONEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:17-82-JPG-CJP |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

## **MEMORANDUM and ORDER**

In accordance with 42 U.S.C. § 405(g), plaintiff Thomas A. Mooney seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

### **Procedural History**

Plaintiff filed for DIB and SSI on May 13, 2013, alleging disability beginning April 6, 2013. (Tr. 279-93.) These claims were denied initially and again upon reconsideration. (Tr. 108, 110, 129, 131.) Plaintiff then filed a request for an evidentiary hearing, which administrative law judge (ALJ) Lisa Leslie conducted in April 2015. (Tr. 156-60, 47-92.) ALJ Leslie issued an unfavorable opinion in August 2015. (Tr. 19-46.) The Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1-6.) Plaintiff exhausted his administrative remedies and filed a timely complaint with this Court. (Doc. 1.)

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erroneously evaluated the opinion of Dr. Andrew Mahtani, plaintiff's primary care physician.

2. Substantial evidence did not support the credibility determination.

## Applicable Legal Standards

To qualify for SSI and/or DIB, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit.  20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity.  The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement.  The third step compares the impairment to a list of impairments that

---

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423 *et seq.*, and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c *et seq.*, and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925, detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The ALJ's Decision

ALJ Leslie followed the five-step analytical framework set forth above. She determined plaintiff met the insured status requirements through December 31, 2017, and had not engaged in substantial gainful activity since the alleged onset date. (Tr. 24.) She then opined plaintiff had severe impairments of traumatic optic neuropathy in the right eye; history of right humerus fracture with open reduction, internal fixation, and acute radial nerve palsy; extensive head and face injuries with resolved intracranial bleeding, facial reconstructive surgery with internal

fixation, and encephalomalacia; history of vertebral compression fractures in the thoracic and lumbar spines without canal or foraminal stenosis; and degenerative disc disease. (Tr. 25.) ALJ Leslie found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. 27.) Furthermore, plaintiff had the RFC to perform light work with several restrictions. (Tr. 28.) The ALJ opined plaintiff was unable to perform past relevant work but was not disabled because he could perform other jobs that existed in the national economy. (Tr. 38-39.)

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### 1. Agency Forms

In the agency forms, plaintiff indicated that blindness in his right eye, an inability to use his right arm, and metal plating on his face limited his ability to work. (Tr. 313.)

Plaintiff worked as the owner and chief manager of an auto-body repair shop from 2007 to 2013, earning $1,000 per week. (Tr. 314.) After a motorcycle accident, he had to close his business and let his employees go. (Tr. 326.)

From the time he woke up until the time he went to bed, plaintiff got dressed, took care of his hygiene, napped, took medications, watched television, and went to doctor and therapy appointments. Plaintiff tried to cook for his son, but his son and his mother helped with cleaning, laundry, and meals. Plaintiff's pain kept him awake at night. He could not use his right arm or hand to do anything. (Tr. 320.) He needed help with combing his hair, showering, eating, and taking medications. He prepared small snacks for himself, but his mom prepared

meals for him. Plaintiff had difficulty concentrating. He was not able to perform any household chores. (Tr. 321.) Plaintiff rarely went outside because of his blindness and disfigurement. He could not see well enough to drive long distances. Plaintiff went grocery shopping once a month. (Tr. 322.)

Plaintiff's interests included motorcycles and working on cars. However, he could no longer do either. He did not socialize a lot because he was in pain and did not leave the house unless he needed to. (Tr. 324-25.)

Plaintiff could lift five pounds. He could walk about one block before needing a ten to fifteen minute break. He had memory and concentration problems. (Tr. 324.)

Plaintiff could sit for about thirty minutes before he needed to stand up and walk around. He experienced pain "just from being up." (Tr. 329.)

Plaintiff's mother completed a third-party function report and stated plaintiff could not see to do the simplest of tasks and had limited mobility in his arm due to steel and pins, a skull fracture, and numerous broken bones. (Tr. 363-72.)

## 2. Evidentiary Hearing

ALJ Leslie conducted an evidentiary hearing in April 2013 at which plaintiff was represented by counsel. (Tr. 47-92.) Plaintiff's attorney stated plaintiff was a forty-three year old man with a seventh-grade education. His primary problems were right-eye blindness and various back problems, which occurred because of multiple automobile and motorcycle accidents. Plaintiff underwent facial reconstruction with metal plating in his face, which caused significant pain and abscesses. He also had problems with his right arm and shoulder blade. (Tr. 53.)

Plaintiff lived with his fiancée and sixteen-year old son. He had a driver's license but found it difficult to drive because he had to physically turn and look to see the right side. He drove about once every two weeks for about twenty miles. (Tr. 54-55.)

Plaintiff's vision was "okay" in his left eye. He had no vision in his right eye, so he had no depth perception. He frequently bumped into things and fell. His doctors discussed using a cane, but plaintiff did not use one. (Tr. 60.)

Plaintiff had pain in his right arm, and he could not reach, put his hand above his head, or lift as he used to. (Tr. 61.) Plaintiff also had pain in his spine, lower back, legs, and head, and lost sensation in his fingertips. He could not sit for long periods. (Tr. 62.) If plaintiff sat for forty to forty-five minutes, he started losing feeling in his fingertips, his right foot tingled, he had pain in his lower back, and he experienced shooting pain down his right leg. When he went to stand up, he would hit the floor because his right leg felt "dead." (Tr. 69-70.) Plaintiff could stand for no more than fifteen to twenty minutes. (Tr. 70.) On his best day, plaintiff was limited to walking a city block before he had to stop due to back pain and exhaustion. (Tr. 70.) Plaintiff could not lift more than twenty pounds with his left arm. He could lift a gallon of milk with his right arm. (Tr. 70-71.)

Plaintiff's face was reconstructed after an accident, and changes in weather affected the hardware in his face. Pain often kept him up at night. He had extensive problems with abscesses, for which he was hospitalized many times. They appeared all over his body, including his neck, face, head, and back. (Tr. 63-64.)

Plaintiff broke his shoulder blade on the right side, which limited his mobility. (Tr. 65.)

With medication, plaintiff's pain was at a 7/10 on an average day. Plaintiff had bad days about twenty times each month, where he would experience increased pain and have to sit for

thirty to forty-five minutes with his feet elevated. Once an hour, he would have to stand and move around. He also turned the lights off, because they aggravated the pain in his head. He did not go outside on bad days. Plaintiff's pain hindered his ability to concentrate. (Tr. 65-66.)

Plaintiff took Ambien, Melatonin, and ZzzQuil to sleep and Sertraline for depression. Plaintiff had days where he cried "like a baby." He stated he was once a self-sufficient man who did very well, but was not that person anymore. Depression was never an issue for him prior to his accidents. (Tr. 67-68.) Plaintiff had headaches fifty to sixty percent of each month. (Tr. 68.) Plaintiff could sweep with his left arm and could grocery shop if he took breaks. (Tr. 71.)

Christina Mesey, plaintiff's fiancée, testified next. She lived with plaintiff and assisted him with bathing, preparing meals, running errands, and coordinating his medications. (Tr. 76-77.) Ms. Mesey testified that plaintiff loved to work and had a difficult time not being a provider anymore. (Tr. 78-79.)

A vocational expert (VE) then testified regarding hypothetical individuals with plaintiff's age, education, and past job experience, with various RFCs. The VE opined plaintiff's past relevant work required medium exertion but was "at the very heavy level as performed." The VE opined that an individual with the RFC finding found by the ALJ could not perform plaintiff's past work but could perform other jobs that existed in the economy. (Tr. 82-85.)

### 3. Medical Records

On March 28, 2013, plaintiff presented to Red Bud Regional Hospital with mid-to-upper back pain. Earlier that week, he lost control of his truck after he swerved to avoid a deer. He was driving about sixty miles per hour. The truck rolled, hit a bridge, and the roof "crushed in." (Tr. 401.) X-rays of plaintiff's thoracic and lumbar spine revealed no acute fractures. Clinical

impressions included contusions of the lower and mid back. He received a prescription for Vicodin and was discharged to home in a stable condition. (Tr. 404-06.)

On April 6, 2013, plaintiff lost control of his motorcycle and crashed. He was intubated at DePaul Hospital and transferred to the intensive care unit at St. Louis University Hospital (SLUH). (Tr. 454-67.) He suffered intracranial bleeding, a leforte III facial fracture, a subarachnoid hemorrhage, traumatic pneumocephalus, bilateral pulmonary contusion, a right scapula fracture, T1-T3 superior endplate fractures, a T8-T10 spinous process fracture, an L1-L5 transverse process fracture, multiple rib fracture, acute radial nerve palsy, pulmonary embolism, deep venous thrombosis, and hypernatremia. (Tr. 442.)

On April 15, 2013, plaintiff underwent an open reduction internal fixation of the right orbital, and frontal and maxillary sinus fixation. (Tr. 666-69.)

On April 26, 2013, plaintiff underwent an open reduction and internal fixation of the right mid-shaft humeral fracture. (Tr. 657.)

On May 9, 2013, plaintiff was discharged to home in a stable condition with prescriptions for oxycodone, Percocet, Catapress, and Flexeril. He also received clonidine and Seroquel for his agitation and was cleared for discharge with twenty-four-hour supervision. Plaintiff was instructed to remain on a soft diet for six weeks and refrain from driving, vigorous activity, lifting over ten pounds, and bearing weight on his right arm. Plaintiff's physician recommended outpatient occupational therapy and follow-up appointments with ophthalmology, neurosurgery, orthospine, orthopedics, and plastics. (Tr. 409-12, 468-73.)

On May 14, 2013, plaintiff underwent an initial outpatient evaluation for occupational therapy. He reported constant pain in his right shoulder and was wearing a sling. He was alert and oriented but demonstrated agitation/aggression, visual deficits, difficulty reading, limited

comprehension, and decreased memory. Plaintiff's problems included decreased activities of daily living (ADLs), sensation, balance, transfer ability, coordination, strength, safety awareness, and range of motion (ROM); increased pain; reduced/limited work ability; and fall risk. The therapist diagnosed plaintiff with right radial palsy and recommended therapy twice a week for ten weeks. (Tr. 413-15.) Plaintiff was discharged from occupational therapy after fourteen visits. He felt like his arm was getting better, and he achieved all of his short-term goals (right grip strength at 5, right shoulder elevation to forty degrees, pain at a 2/10, and right wrist extension to fifteen degrees). (Tr. 423.)

Plaintiff presented to Dr. Rindha Reddy, an ophthalmologist, on May 24, 2013, for a follow-up regarding his traumatic optic neuropathy. His left eye was "doing well" but his right eye had no vision. (Tr. 442-51.)

On June 4, 2013, plaintiff presented to Dr. John Watson, an orthopedic surgeon, for a follow-up. Dr. Watson prescribed plaintiff oxycodone and instructed him not to lift more than five pounds. (Tr. 452.)

Plaintiff also presented to Dr. Dirk Alander on June 4, 2013, regarding his compression fractures. X-rays showed good maintenance position of the endplate fractures at T1, T2, and T3, as well as the T9 fracture. Plaintiff had no pain to percussion and could go up and down on his heels. He moved about the room easily. Dr. Alander recommended progressive activity to tolerance and noted plaintiff was "really going to be limited by his scapular and humerus fracture, so not to worry about him lifting weights when his other fractures are healed." Plaintiff was "good to go with no restrictions." (Tr. 654-56.)

On July 3, 2013, plaintiff followed-up with Dr. Alander, who noted, "Plan is progressive mobilization from spine standpoint. Activity as tolerated . . . ." (Tr. 673.)

Plaintiff also presented to Dr. Pooya Javidan at Saint Louis University Orthopaedic Spine Surgery Clinic on July 3, 2013. Plaintiff had minimal pain to palpation on his back and was "doing well otherwise." His right shoulder and arm were progressing. He demonstrated diminished ROM in his back, his motor strength was 5/5 in the bilateral lower extremity, and his sensation was intact in the bilateral lower extremity. Dr. Javidan discharged plaintiff from the spine clinic and recommended activity as tolerated. (Tr. 675.)

On December 5, 2013, Dr. Vitall Chapa evaluated plaintiff. Dr. Chapa diagnosed plaintiff with status post multiple injuries of the right upper extremity, status post facial reconstruction, and blindness in the right eye. On examination, plaintiff was able to bear weight and ambulate without any aids, and his gait was normal. He demonstrated muscle atrophy of the right deltoid muscle. His motor strength of the right upper extremity was 4/5, and his motor strength of the lower extremities was 5/5. Lumbosacral spine flexion was normal, a straight leg raising test was negative, bilaterally, and plaintiff had limited ROM of the right shoulder, elbow, and wrist. Plaintiff's grip strength in the right hand was 3/5. He had a moderate degree of weakness in fine and gross manipulative movements of the right hand and fingers. Plaintiff had no injury to the lower extremities. (Tr. 677-83.)

On December 28, 2013, plaintiff presented to Red Bud Regional Hospital with complaints of abscesses to the top of his head, headaches, and right upper back pain. Plaintiff received morphine, prescriptions for Bactrim DS, Vicodin, and Ultram, and was discharged home. (Tr. 702-03.)

On January 31, 2014, plaintiff presented to Red Bud Regional Hospital with complaints of lower back pain. He reported he experienced pain that morning and had difficulty getting out of bed. He "had been lifting lately." Plaintiff was assessed with acute low back pain and an acute

lumbar myofascial strain.  He received prescriptions for Tramadol and cyclobenzaprine and was discharged home.  (Tr. 699-701.)

On March 6, 2014, plaintiff presented to Illinois Eye Surgeons for a diabetic eye examination.  Plaintiff stated he had hardly any visual acuity in his right eye.  The optic nerve was reportedly moved during total facial reconstruction surgery.  He alleged his vision was doing well in the left eye but felt it could be strained from compensating for the right.  (Tr. 687-91.)

On April 15, 2014, plaintiff presented to Comprehensive Pain Specialists (CPS) to begin pain management for headaches and pain in his face, neck, arms, right leg, eye, abdomen, and mid-back.  On examination, plaintiff was able to walk on his tiptoes and heels without difficulty; he had decreased sacroiliac joint mobility, bilaterally; Kemp's was positive, bilaterally, for lower back pain; and he had limited ROM of the spine in all directions.  Straight leg raising test was negative, bilaterally; his gait was normal; and he had normal muscle strength and tone.  The cervical spine exam demonstrated pain and decreased ROM with flexion/extension, lateral flexion/extension, or left/right rotations.  Palpation of the cervical spine was positive for focal tenderness and his paracervical muscles were taut.  Plaintiff's motor strength, bulk, and tone were normal in the upper extremities.  His sensation to pinprick and vibration sense was intact in the bilateral lower extremities.  Plaintiff was prescribed Norco, Nabumetone, gabapentin, and cyclobenzaprine for his neck.  Diagnostic imaging of plaintiff's cervical spine, thoracic spine, shoulder, and lumbar spine were ordered.  Plaintiff was to follow-up in two weeks.  (Tr. 710-22.)

Images of plaintiff's lumbosacral spine showed mild multilevel spondylosis, mild interspace narrowing at the L5-S1, slight loss of vertebral body height of L1, nonspecific for old acquired mild compression versus a possible normal variant, and no subluxation.  (Tr. 727.)  Images of his left shoulder showed no fracture or dislocation.  It showed aligned healing or healed fracture of

the fourth and fifth ribs, laterally on the left. (Tr. 728-29.) Images of plaintiff's thoracic spine raised the question of a slight superior endplate compression of the T1, T2, and T3, not well delineate d on swimmer's lateral views of the thoracic spine. (Tr. 730.) Images of plaintiff's right shoulder showed superior displacement of the distal clavicle from the acromion process, with bony bridging noted between the distal clavicle and the acromion process. Bony bridging was also noted between the coracoid process and the clavicle, along with "prominent bone osteophyte inferior flenoid process. Multiple healed rib fractures on the right, plate and screw fixation of the mid right humeral diaphysis with incomplete visualization of what appeared to be a healing or healed fracture of the right humerus." (Tr. 731.) Images of his cervical spine demonstrated no fracture, subluxation, or bone destructive process in the cervical spine. Multilevel degenerative changes were noted. (Tr. 732.)

On August 18, 2014, plaintiff presented to CPS and reported severe pain in his left upper extremity. His current regimen was not providing any relief or helping with his quality of life. Plaintiff received a prescription for MS Contin and was instructed to use Norco for breakthrough pain. His gabapentin was continued and he restarted Nabumetone and Baclofen. Plaintiff also received trigger point injections. (Tr. 948-51.)

On September 11, 2014, plaintiff presented to CPS and received trigger point, triamcinolone acetonide, and ropivacaine hydrochloride injections (hereinafter "injections"). (Tr. 942-43.) He also received refills for his Norco, gabapentin, Nabumetone, and Baclofen. His MS Contin was increased. (Tr. 946.)

On September 18, 2014, plaintiff presented to CPS and received injections and a refill of gabapentin. (Tr. 938-40.)

On October 2, 2014, plaintiff presented to CPS and stated he got good relief with trigger point injections. His gabapentin, MS Contin, Baclofen, Nabumetone, and Norco prescriptions were refilled and he received injections. (Tr. 930-34.)

Plaintiff presented to CPS on October 8, 2014. He stated he was getting good pain relief with the trigger point injections and proceeded to receive additional injections. (Tr. 927-29.)

On October 22, 2014, plaintiff presented to CPS. Ten trigger points were identified over the left deltoid, left trap, left rhomboid, and bilateral multifidus and gluts min and max. Plaintiff's gabapentin, Baclofen, Nabumetone, and cyclobenzaprine were refilled and he received injections. (Tr. 923-26.)

On October 23, 2014, plaintiff presented to St. Anthony's Medical Center following a motorcycle crash. Plaintiff reported he was returning to work at his collision center, travelling approximately thirty-five miles per hour, when he struck a vehicle. He complained of low back, left elbow, and left lower extremity pain. On examination, plaintiff demonstrated normal motor and sensory function. (Tr. 1102-04.) Two x-rays of his left elbow did not reveal any fracture or dislocation. An x-ray of his left forearm was also negative. A CT scan of his head revealed right frontotemporal encephalmalacia and old right facial fractures. A CT of his cervical spine showed spondylosis but no fracture. A CT of plaintiff's lumbar spine demonstrated an acute compression fracture of the superior endplate of L3. A chest x-ray showed multiple healed right rib fractures and no acute infiltrate. A CT of the chest, abdomen, and pelvis showed remote post-traumatic changes primarily in the right rib cage and no evidence of acute fracture. He was diagnosed with a compression fracture of the lumbar spine, placed in a thoracolumbar spinal orthosis back brace, and discharged home. (Tr. 1105-60.) Dr. Chen examined plaintiff and noted full muscle strength throughout all extremities. A CT scan of plaintiff's lumbar spine

showed an L3 fracture with two column involvements.  Dr. Chen's plan included spine caution, an x-ray to rule out instability, a lumbo sacral orthosis (LSO) brace, and pain management.  (Tr. 885-88.)  On October 25, 2014, plaintiff reported his pain was significantly improved.  No surgical intervention was recommended.  (Tr. 889.)  He also presented to physical therapy, which determined that plaintiff's gait was within functional limitations and independent and that plaintiff did not need therapy.  (Tr. 1132.)

On October 30, 2014, plaintiff presented to CPS, and his provider approved one extra Norco per day due to his lumbar fracture.  (Tr. 920-22.)

On November 25, 2014, plaintiff presented to CPS.  He received trigger point injections for his myalgia and myositis NOS and limb pain.  His gabapentin, Baclofen, Nabumetone, and Norco were refilled, and he was started on MS Contin.  (Tr. 915-19.)

On December 4, 2014, plaintiff presented to Dr. Chen at St. Anthony's Medical Center for a follow-up regarding injuries related to his motorcycle accident.  Plaintiff's pain was tolerable and he had no weakness or numbness except the unchanged lateral thigh numbness on the left side. AP and lateral lumbar spine x-rays showed further decreased height of L3.  He demonstrated 5/5 strength throughout all extremities.  Plaintiff was to continue with the LSO brace for another six weeks.  (Tr. 879-80.)

On January 3, 2015, plaintiff presented to Red Bud Regional Hospital with complaints of facial swelling and an abscess in his nose.  He was prescribed Norco and Bactrim DS and discharged home.  (Tr. 1020-30, 1033-36.)

On January 15, 2015, plaintiff presented to St. Anthony's Medical Center for a follow-up examination regarding injuries related to his motorcycle accident.  X-rays of plaintiff's AP and lateral lumbar spine showed an L3 fracture without signs of instability.  Plaintiff demonstrated

5/5 strength throughout all extremities and his gait was normal.  Dr. Chen opined plaintiff could be off his LSO brace in about two weeks.  (Tr. 877-78.)

On January 21, 2015, plaintiff presented to CPS and reported his chronic pain was stable. He was assessed with long term use of opiate analgesic, myalgia and myositis NOS, joint pain in his shoulder, limb pain, neck pain, thoracic spine pain, headaches, opioid dependence, and low back pain.  His MS Contin was decreased and his Norco was refilled, along with his gabapentin, Nabumetone, and Baclofen.  Plaintiff's cyclobenzaprine was stopped.  (Tr. 910-14.)

### 4.  Dr. Andrew Mahtani's Treatment Records

Dr. Andrew Mahtani was plaintiff's primary care physician during the relevant period. Dr. Mahtani indicated he began treating plaintiff in July 2014 (Tr. 1096), although the record contains treatment notes from Dr. Mahtani dating back to February 19, 2014.  (Tr. 754-57.)  Dr. Mahtani assessed plaintiff with chronic pain, anxiety, and vision loss, prescribed a variety of medications, and made several referrals throughout his treatment of plaintiff.

In February 2014, Dr. Mahtani prescribed plaintiff cyclobenzaprine, Naprosyn, Neurontin, and Vicodin.  He also referred plaintiff to a pain specialist and ophthalmologist.  (Tr. 754-57.) On March 12, 2014, plaintiff told Dr. Mahtani he was recently in the emergency room with gallstones.  Dr. Mahtani referred plaintiff to a general surgeon and pain management.  (Tr. 743-46.)  On May 15, 2014, plaintiff requested pain medications, and Dr. Mahtani prescribed Norco. (Tr. 740-42.)  On June 9, 2014, plaintiff complained of pain at night.  Dr. Mahtani did not alter plaintiff's medications.  (Tr. 906-09.)  On June 16, 2014, plaintiff reported he was doing poorly with pain.  Dr. Mahtani prescribed Norco and Zoloft.  (Tr. 904-07.)  Plaintiff presented to Dr. Mahtani on July 17, 2014.  Dr. Mahtani did not alter plaintiff's medications.  (Tr. 900-03.)  On August 14, 2014, Dr. Mahtani refilled plaintiff's Naprosyn and Neurontin prescriptions.  (Tr.

895-99.)  On September 29, 2014, plaintiff stated he was doing much better with pain management.  Dr. Mahtani refilled plaintiff's Naprosyn and Neurontin.  (Tr. 890-94.)

Dr. Mahtani completed a Physical Medical Source Statement in March 2015.  Dr. Mahtani diagnosed plaintiff with back pain, legal blindness in his left eye, and decreased strength in the right upper extremity.  Dr. Mahtani indicated supporting clinical findings included decreased ROM in the right shoulder and a poor gait.  (Tr. 1096.)  He further opined that plaintiff could walk one block before needing to rest; sit for forty-five minutes at a time; stand for one hour at a time; sit for a total of about two hours in an eight-hour workday; and stand/walk for about four hours in an eight-hour workday.  Plaintiff needed to shift positions and walk throughout the workday.  Plaintiff also required unscheduled, fifteen-minute breaks at least every hour and a half.  (Tr. 1097.)  Plaintiff needed to elevate his leg fifty percent of the workday due to decreased sensation.  He could occasionally lift up to ten pounds, rarely lift up to twenty pounds, and never lift up to fifty pounds.  Plaintiff could never twist, stoop, or climb ladders, and could occasionally crouch and climb stairs.  He had significant limitations with reaching, handling, or fingering.  (Tr. 1098.)  Plaintiff would be off-task twenty-five percent of the workday or more and be absent more than four days per month.  Plaintiff had decreased hearing and was intolerant to heat.  (Tr. 1099.)

### Analysis

Plaintiff first asserts the ALJ erred in not assigning controlling weight to Dr. Mahtani's opinions.  However, a treating physician's opinion regarding the nature and severity of a claimant's medical condition is entitled to controlling weight only if it is "not inconsistent with other substantial evidence" and is "well-supported."  *Johansen .v Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 404.1527(c).  When assessing the medical opinions in the record, the

ALJ is required to build a logical bridge between her conclusions and the record and "minimally articulate[]" her reasoning. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). This is a "very deferential standard" the Seventh Circuit has deemed "lax." *Id.*

In the present case, the ALJ found Dr. Mahtani's opinions unsupported and incompatible with other medical evidence in the record. For example, in March 2015, Dr. Mahtani opined plaintiff had decreased right arm strength and a poor gait. Dr. Mahtani last treated plaintiff in September 2014. However, in April 2014, plaintiff's nurse practitioner noted a normal gait and normal muscle strength in the upper extremities. (Tr. 714.) Plaintiff presented to a physical therapist in October 2014, following a motorcycle accident. The therapist stated plaintiff's gait was within functional limitations and independent, and therapy was not warranted. (Tr. 1132.) In December 2014, Dr. Chen noted 5/5 strength throughout all extremities. (Tr. 879.) In January 2015, Dr. Chen again reported 5/5 strength throughout all extremities and a normal gait. (Tr. 877.)

Dr. Mahtani also opined plaintiff had to elevate his leg due to decreased sensation, was limited to using his right hand for fine manipulation for half of a workday, had decreased hearing, and was intolerant to heat. (Tr. 37.) ALJ Leslie gave these opinions little weight because the record did not indicate any medically determinable impairments that would account for these limitations. Indeed, Dr. Mahtani's treatment notes do not include any findings that bolster these opinions, nor did he point to any "medically acceptable clinical and laboratory diagnostic techniques" that support the degree of limitation he imposed. 20 C.F.R. § 404.1527(d)(2). No other medical source noted a hearing impairment or heat intolerance throughout the entire relevant period, and plaintiff had not demonstrated decreased sensation in the lower extremities since 2013. Plaintiff was discharged from Saint Louis University's spine

clinic in July 2013 with intact sensation in the bilateral lower extremity.  (Tr. 675.)  In December

2013, Dr. Chapa noted plaintiff had no injury to the lower extremities.  (Tr. 679.)  During a pain

management examination in April 2014, plaintiff's nurse practitioner noted, "sensation to

pinprick and vibration sense intact in the bilateral lower extremities."  (Tr. 711.)

In the RFC determination, the ALJ did limit plaintiff to "occasional" fine manipulations

of the right hand, and Dr. Chapa also found plaintiff had limitations in this area.  Thus, ALJ

Leslie did not set forth a clear path of reasoning in criticizing Dr. Mahtani's opinions regarding

fine manipulations.  However, the ALJ's decision need not be perfect, as long as it is rests on

substantial evidence.  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

Because Dr. Mahtani's opinions were inconsistent with other evidence and largely

unsupported, the ALJ was not required to give them controlling weight.  *Dixon v. Massanari*,

270 F.3d 1171, 1177 (7th Cir. 2001) (ALJ properly assigned less-than controlling weight to a

treating physician's opinion where objective evidence did not support the findings and the

physician did not elaborate on the bases of his opinions).

Once the ALJ determined Dr. Mahtani's opinions were not entitled to controlling weight,

the opinions became another piece of evidence for the ALJ to weigh.  *Bauer v. Astrue*, 532 F.3d

606, 608 (7th Cir. 2008).  The regulations set forth several factors for weighing medical

evidence, including (1) the length of the treatment relationship; (2) the nature and extent of the

treatment relationship; (3) supportability; (4) consistency; and (5) specialization.  20 C.F.R.

§ 404.1527.

ALJ Leslie's opinion demonstrates she considered the majority of these factors in

assigning "some weight" to Dr. Mahtani's statements.  She acknowledged Dr. Mahtani as a

treating source (factor two), but noted he had not treated plaintiff for six months at the time he

rendered his opinions. The ALJ further stated that Dr. Mahtani only provided referrals for most of plaintiff's ailments (factors two and five), and, as discussed above, his opinions were inconsistent with other evidence and unsupported (factors three and four).

Plaintiff cites to a litany of medical records that tends to bolster his claim of disability. In particular, plaintiff asserts the ALJ should have given more credence to his complaints of pain. ALJ Leslie, however, provided a summary of plaintiff's subjective complaints and discussed plaintiff's pain treatments, including medications and trigger point injections. (Tr. 33, 34, 36.) The ALJ is not required to discuss every piece of evidence as long as she does not ignore an entire line of evidence contrary to her ruling. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)**.** Moreover, the ALJ is tasked with resolving conflicts in the record and this Court's role on review is limited to determining whether substantial evidence supports the decision. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Here, ALJ Leslie provided an adequate explanation of her decision not to give controlling weight to Dr. Mahtani's opinions and she evaluated the opinions in accordance with the regulations. Thus, the ALJ's assessment of the medical evidence does not warrant remand.

Plaintiff also contends the ALJ's credibility determination was erroneous. The Court applies an "extremely deferential" standard when reviewing the ALJ's credibility determination, and will not disturb it unless it was "patently wrong." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013).

ALJ Leslie found plaintiff partially credible for many reasons, including: plaintiff inaccurately described injuries in the record; the field officer noted plaintiff seemed "confused about some items about his accident and what was going on with his appointment"; plaintiff reported he "had been lifting lately" in a medical report, which was inconsistent with his alleged

limitations at that time; the lack of complaints, observed abnormalities, and treatments for plaintiff's right hand and arm were inconsistent with his allegations of right arm pain; no medically determinable impairment supported plaintiff's complaints of neck pain; plaintiff stated he needed to elevate his leg, but his nurse practitioner advised against prolonged bed rest; and plaintiff rode a motorcycle, which was inconsistent with his alleged back, neck, and reaching limitations.

Plaintiff essentially argues the ALJ cherry-picked from the record and did not fully develop plaintiff's testimony before drawing negative inferences from it. For instance, plaintiff asserts the ALJ should have determined why plaintiff "had been lifting lately" and did not frequently seek medical treatment. The Seventh Circuit has held that ALJs must explore the claimant's explanations as to the lack of medical care before drawing inferences and should generally be cautious in drawing any negative inferences from underdeveloped testimony. *Murphy v. Colvin*, 759 F.3d 811, 816-17 (7th Cir. 2014). However, "[i]n analyzing the ALJ's opinion for such fatal gaps or contradictions, we give the opinion a commonsensical reading rather than nitpicking at it." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (internal quotations omitted).

While ALJ Leslie's credibility determination was not flawless, it was also not patently wrong. For instance, ALJ Leslie noted plaintiff inaccurately described his injuries, the objective evidence did not support plaintiff's reported pain, and plaintiff's ability to ride a motorcycle was inconsistent with his alleged limitations. Even minor discrepancies in the record may be sufficient to support the credibility determination, and given the extremely deferential standard employed on review, the ALJ need only provide "some evidence supporting her determination." *Bates*, 736 F.3d at 1098. Because the ALJ provided several specific reasons supported by the

record, the determination will not be overturned. *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015).

**Conclusion**

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **AFFIRMED.**

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**
**DATE: November 6, 2017**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**
